2026 IL App (1st) 250549-U

No. 1-25-0549

Order filed August 11, 2026

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| IN SOO LEE, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CH 2457 |
| | ) | |
| KWANG SOO LEE, | ) | Honorable |
| | ) | Allen P. Walker, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court.
Justices McBride and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1　　*Held*:　We affirm the trial court's judgment in defendant's favor over plaintiff's contention that the trial court's rulings on all counts are either against the manifest weight of the evidence or legally erroneous.

¶ 2　　Plaintiff In Soo Lee alleged that his brother, defendant Kwang Soo Lee, fraudulently coerced him to sign an unenforceable quitclaim deed that conveyed half of plaintiff's interest in a business property to defendant. Following a bench trial, the trial court found in defendant's favor on all six counts of plaintiff's second amended complaint. On appeal, plaintiff argues that the trial

court's rulings on all counts are either against the manifest weight of the evidence or legally erroneous. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     According to the joint statement of uncontested facts the parties submitted prior to trial, plaintiff and defendant are brothers who immigrated to the United States from South Korea in the 1980s. Both men have owned and operated several beauty supply businesses since that time.

¶ 5     In 1991, the parties formed a wholesale beauty supply business called Giant Beauty Distributors (GBD). Each brother owned 50% of the business. The parties jointly purchased a property on the 2700 block of West Armitage Avenue (the Armitage property) to serve as GBD's headquarters. Each brother had a 50% interest in the Armitage property.

¶ 6     In 2015, the parties agreed to sell the Armitage property to a third party for $4.25 million. In anticipation of this sale, on February 12, 2016, the parties signed a quitclaim deed that conveyed a 75% interest in the Armitage property to defendant and a 25% interest to plaintiff. Attorney Soo Yeon Lee prepared the quitclaim deed.[1] The sale closed on March 1, 2016, with net proceeds of $2,998,396.71. The parties split these proceeds pursuant to the quitclaim deed. Defendant received $2,248,797.53 and plaintiff received $749,599.18.

¶ 7                                    A. Complaint

¶ 8     Plaintiff's second amended complaint alleged that defendant forced plaintiff to sign an incomplete copy of the quitclaim deed by falsely claiming it was necessary to sell the Armitage property. Plaintiff, who speaks little English, did not understand what he was signing and did not intend to convey half of his interest in the Armitage property to defendant. At the March 1, 2016,

_____

[1]The record does not indicate whether attorney Lee is related to the parties.

closing, defendant presented the quitclaim deed to the title company and claimed that he and plaintiff had agreed to reallocate their ownership interests in the Armitage property. As a result, defendant received 75% of the Armitage property sale proceeds and plaintiff received 25%.

¶ 9    Plaintiff alleged six counts that proceeded to a bench trial: (1) fraud in the inducement, (2) recission based on fraud, (3) recission based on lack of consideration, (4) unjust enrichment, (5) breach of fiduciary duty, and (6) violation of the Joint Tenancy Act (765 ILCS 1005/1 *et seq.* (West 2016)).

¶ 10                                    B. Trial

¶ 11                              1. Quitclaim Deed

¶ 12    The parties stipulated to the admission of the quitclaim deed. It is written in English and states:

> "THE GRANTOR(S), KWANG SOO LEE and IN SOO LEE, as joint tenants, for and in consideration of Ten Dollars ($10.00), receipt of which is hereby acknowledged, CONVEY(S) and QUIT CLAIM(S) to
>
> KWANG SOO LEE as to an undivided 75% interest, and IN SOO LEE as to an undivided 25% interest,
>
> 100% of the Grantor(s)['] interest in the following described Real Estate situated in the County of Cook in the State of Illinois, to wit: [Description of the Armitage property]."

Both parties signed the quitclaim deed on February 12, 2016. Elizabeth Schillen notarized it the same day. The quitclaim deed states that Soo Yeon Lee prepared it.

¶ 13                                 2. Plaintiff

¶ 14    Plaintiff testified through a Korean interpreter. He described his spoken English as "[a]verage" and testified that he could read English, but not well. Plaintiff immigrated to the United States from South Korea in 1982. Plaintiff has owned and operated beauty supply businesses since 1985. Defendant is his older brother.

¶ 15    In 1991, the parties purchased the Armitage property for approximately $480,000. Plaintiff and defendant each had a 50% interest in the property and a 50% interest in GBD, the wholesale beauty supply business they operated from that property. Plaintiff was GBD's vice president and defendant was its president.

¶ 16    Plaintiff knew that defendant obtained a home equity line of credit (HELOC) and used it to loan money to GBD. Plaintiff did not "know how much money [defendant] provided and took out;" rather, he "just assumed that, okay, [defendant] knows what he's doing." At his deposition, plaintiff testified that he and defendant discussed repaying defendant for those loans, but at trial, plaintiff claimed his deposition testimony was mistaken. Plaintiff had access to GBD's financial records but did not review them because he was busy managing the warehouse and making deliveries.

¶ 17    In 2016, plaintiff and defendant agreed to sell the Armitage property for $4.25 million. In February 2016, defendant told plaintiff he would receive less than half the property sale proceeds, which caused an argument and a physical altercation. Defendant kicked a table, tried to hit plaintiff with a liquor bottle, struck plaintiff in the face, and threatened him with a knife.

¶ 18    Attorney Soo Yeon Lee represented plaintiff throughout the sale of the Armitage property, but defendant handled all communication with her. Plaintiff met attorney Lee one time near the

end of the transaction. Defendant and attorney Lee told plaintiff to sign documents and he complied.

¶ 19    Plaintiff acknowledged that he signed the quitclaim deed but testified that he did so only because defendant told him he had to sign it to sell the Armitage property. Before plaintiff signed the quitclaim deed, nobody translated it into Korean and nobody explained that it would result in him receiving only 25% of the property sale proceeds. The quitclaim deed plaintiff signed did not mention the 75/25 split. Defendant did not give plaintiff anything in exchange for signing the quitclaim deed. Plaintiff never agreed to defendant acquiring a 75% interest in the Armitage property and never agreed to transfer half of his interest to defendant.

¶ 20    A property sale master statement, which plaintiff moved into evidence, reflects that plaintiff received $749,599.18 and defendant received $2,248,797.53 from the sale of the Armitage property.

¶ 21                                3. Defendant

¶ 22    Defendant testified that he immigrated to the United States from South Korea in 1981. In 1991, he and plaintiff formed a wholesale supply business named GBD, which operated from the Armitage property. Each brother had a 50% interest in GBD. Defendant was the company's president and managed finance and accounting; plaintiff was the vice president and managed warehouse operations. Defendant kept GBD's financial records both digitally and in hard copy at the office. Plaintiff had access to these documents and defendant never prevented him from reviewing them.

¶ 23    In 2002, GBD was struggling, so defendant began loaning the company money to buy inventory and pay other debts. Plaintiff knew defendant was lending money to GBD and agreed

that defendant would be repaid at some point. However, defendant "did not tell [plaintiff] each time" he loaned money to GBD.

¶ 24    Defendant loaned GBD money from his HELOC with MB Financial Bank as well as his personal checking account. A copy of the HELOC agreement defendant introduced reflects that on July 23, 2009, he obtained a seven-year HELOC with a $285,000 credit limit from MB Financial Bank.

¶ 25    Defendant had no written loan agreements with GBD. He recorded the loans in QuickBooks accounting software and handwritten notes. Defendant moved into evidence (1) a QuickBooks printout documenting his loans to GBD between November 2002 and May 2016; (2) an MB Financial Bank customer loan history documenting his use of his HELOC between November 2002 and September 2012; (3) more than 30 pages of handwritten notes documenting his loans to GBD; (4) handwritten registers documenting checks he wrote to GBD; and (5) three checks he wrote to GBD. The QuickBooks printout categorized loans as "FSH" or "FSH(2)." Defendant testified that "FSH" stood for "from shareholder," *i.e.*, from him. "FSH" referred to cash loans and "FSH(2)" referred to loans he made by writing checks. Defendant loaned GBD additional money from his personal checking account but no longer had records of those loans.

¶ 26    Defendant's evidence of how much he loaned GBD, how much GBD repaid, and how much GBD owed him as of February 2016 varied. In interrogatory responses, defendant claimed that he loaned GBD $2,842,889. At trial, defendant testified that he loaned GBD between $2.3 and $2.4 million. Defendant's handwritten notes state that he loaned GBD $5,941,669. During his direct examination, defendant reconciled certain entries in the documentary evidence and

confirmed 37 loans to GBD between November 2002 and February 2016, which totaled $1,298,300.

¶ 27    Defendant's interrogatory responses stated that GBD repaid $559,959. At trial, defendant testified that GBD repaid $2.2 to $2.3 million. Defendant's handwritten notes indicate that GBD repaid $3,854,629.

¶ 28    Defendant's interrogatory responses claimed that the loans' outstanding balance was $2,282,930. At trial, defendant variously testified that the outstanding balance was $2 million, more than $2 million, and $2.3 million. Defendant's handwritten notes state that the outstanding balance was $2,087,039. GBD's 2015 tax return disclosed outstanding shareholder loans of $2,726,961.

¶ 29    When the parties agreed to sell the Armitage property for $4.25 million, they expected to net approximately $3 million after paying off the mortgage, fees, and expenses. The parties met at defendant's house to discuss how to split the proceeds. Defendant initially suggested that plaintiff would receive $500,000, but plaintiff "begged [him] for an additional $250,000." Defendant agreed, meaning that plaintiff would receive approximately $750,000 and defendant would receive the remaining $2.25 million. Defendant's portion represented his 50% interest in the Armitage property ($1.5 million) plus an additional 25% ($750,000) as partial repayment of the loans he made to GBD. Defendant agreed to accept $750,000 as partial repayment of the loans even though GBD owed him more than $2 million. Defendant acknowledged that he and plaintiff had a physical altercation at some point but denied that it occurred at this meeting.

¶ 30    Under this agreement, the parties' respective shares reflected a 75/25 split of the sale proceeds. They met with attorney Soo Yeon Lee to effectuate that split. Attorney Lee drafted the

quitclaim deed and explained it to the parties in Korean. Plaintiff did not indicate that he did not understand the deed. The parties signed the quitclaim deed at attorney Lee's office and Elizabeth Schillen notarized it. On March 1, 2016, the Armitage property sold for $4.25 million, which netted approximately $3 million after paying off the mortgage, expenses, and fees. Defendant received approximately $2.25 million and plaintiff received approximately $750,000 as they had agreed.

¶ 31                                    4. Soo Yeon Lee

¶ 32    Soo Yeon Lee is a real estate attorney who has been licensed in Illinois since 2005. She speaks fluent Korean and represents Korean-speaking clients. Beginning in 2014, attorney Lee represented the parties in connection with selling the Armitage property. Attorney Lee's initial meeting was with only defendant, but thereafter, she met with both parties together on four to eight occasions. Attorney Lee prepared documents in English and verbally translated them into Korean for the parties. She never had the impression that plaintiff did not understand any document she presented to him.

¶ 33    Two buyers fell through before the parties identified the third buyer to whom they ultimately sold the Armitage property. From the beginning of attorney Lee's representation, the parties intended to use their shares of the Armitage property sale proceeds to buy their own separate business properties. This kind of transaction is called a "1031 exchange" after "IRS Tax Code 1031, [which] allows the property owners to defer capital gains tax, if [they] use the entirety of the sales proceeds to buy another like-kind property." See 26 U.S.C. § 1031 (2008). Nobody told attorney Lee that GBD owed defendant approximately $2 million.

¶ 34    Attorney Lee prepared the quitclaim deed, which was necessary to sever the parties' joint tenancy in the Armitage property so they could sell it to complete their section 1031 exchanges.

Attorney Lee reviewed the quitclaim deed with the parties at her office on February 12, 2016. She explained in Korean that it would give defendant a 75% interest in the property and plaintiff a 25% interest. Attorney Lee and notary Elizabeth Schillen were present when the parties signed the quitclaim deed. All pages of the document were present at signing. Although the quitclaim deed recited $10 as consideration, defendant did not pay plaintiff that or any other amount.

¶ 35    Attorney Lee also identified a real estate transfer declaration she prepared, and plaintiff moved it into evidence. This document states that the "[f]ull actual consideration" for the quitclaim deed was $10.00, that nothing was "given besides money," and that no "part of the transfer price consist[ed] of consideration other than cash." Attorney Lee testified that the parties did not exchange money or anything else of value in connection with the quitclaim deed but acknowledged that she did not know "what payments the brothers might have made between each other."

¶ 36    Attorney Lee identified power of attorney forms she prepared, and the parties stipulated to their admission. The forms reflect that on February 25, 2016, both plaintiff and defendant granted attorney Lee power of attorney over real estate transactions and financial matters until March 16, 2016. Schillen notarized the power of attorney forms. Attorney Lee explained that she prepared these forms so she could sign documents on the parties' behalf at the property sale closing. Neither plaintiff nor defendant attended the March 1, 2016, closing; only she attended on their behalf.

¶ 37                                5. Elizabeth Schillen

¶ 38    Elizabeth Schillen is an attorney and a notary public. She did not recall notarizing the quitclaim deed but confirmed that her signature and notary stamp appeared on it. Schillen testified that when she notarized a document, she ensured that all pages were present and observed the parties signing the document.

¶ 39                                    6. Mu Jung Kim

¶ 40    Mu Jung Kim testified via evidence deposition. He is a certified public accountant who prepared GBD's tax returns using summaries of cash transactions that defendant provided. Defendant told Kim that he loaned money to GBD and provided half a page of notes documenting those loans. Defendant categorized the loans as "SH," which stood for "shareholder." Kim did not independently verify the information defendant gave him.

¶ 41    Kim identified tax returns he prepared for GBD from 2006 through 2015 (except 2007) and defendant moved them into evidence. Each year, GBD disclosed loans from shareholders as liabilities. Loans from shareholders totaled $2,726,961 at the end of tax year 2015.

¶ 42                                    D. Trial Court's Ruling

¶ 43    The trial court issued written findings of fact and conclusions of law. The court ruled in defendant's favor on all counts.

¶ 44                                    1. Findings of Fact

¶ 45    The court found that the parties formed GBD and bought the Armitage property in June 1991. Each brother had a 50% interest in the business and in the property, which they held as joint tenants.

¶ 46    Between November 2002 and March 2016, defendant made a series of loans to GBD, some of which he funded with his MB Financial Bank HELOC. Plaintiff knew defendant was making loans to GBD but did not know the specifics of those loans. In reviewing defendant's documentary evidence of the loans, the court relied primarily on the QuickBooks printout, as defendant testified that was the most accurate record. The court reconciled the QuickBooks printout with the other records, excluded any loans documented only in defendant's handwritten notes, and "confirmed

the existence of outstanding loans amounting to at least $1,030,300.00 as of the date of the sale of the [p]roperty" on March 1, 2016. However, the court did not explain that calculation in detail.

¶ 47    In or around June 2015, the parties agreed to sell the Armitage property for $4.25 million. Before the sale, the parties had at least two meetings at defendant's house to discuss splitting the sale proceeds, one of which resulted in a physical altercation. The court found that it was "uncertain from the record whether the parties ever agreed during those meetings at the [d]efendant's home how the proceeds from the sale of the [p]roperty were to be split." However, the parties "planned to sell the [Armitage] property as part of a 1031 like-kind exchange under Section 1031 of the Internal Revenue Code. They knew the prices of the specific properties they each intended to purchase with their shares of the proceeds."

¶ 48    The parties met with attorney Lee on multiple occasions. On February 12, 2016, the parties went to attorney Lee's office, where she explained in Korean that the quitclaim deed would result in defendant having a 75% interest in the Armitage property and plaintiff having a 25% interest. All pages of the quitclaim deed were present when the parties signed it. The property sale closed on March 1, 2016, and netted $2,990,396.71. The title company distributed the proceeds in accordance with the quitclaim deed, meaning that defendant received $2,248,797.53 and plaintiff received $749,599.18.

¶ 49                              2. Conclusions of Law

¶ 50                          a. Counts I and II: Fraud

¶ 51    The court explained that to establish fraud, plaintiff had to show that defendant made "(1) a false statement of fact; (2) while knowing that it was false; (3) with the intent to induce Plaintiff to sign the quitclaim deed; (4) Plaintiff justifiably relied on that statement; and (5) suffered

damages as a result," citing *Hassan v. Yusuf*, 408 Ill. App. 3d 327, 343 (2011). The court found that "even if Defendant told Plaintiff—intending to induce him to sign the quitclaim deed—that executing the deed was necessary for closing the sale of the Property, the evidence d[id] not establish that Defendant believed this statement to be false." On the contrary, attorney Lee's testimony confirmed that "executing the quitclaim deed was necessary to effectuate [the parties'] plan after the closing." Therefore, the court ruled in defendant's favor on counts I and II.

¶ 52                                    b. Count III: Lack of Consideration

¶ 53     The trial court rejected plaintiff's claim that there was no consideration supporting the quitclaim deed. The court found that GBD owed defendant at least $1,030,300 in outstanding loans as of the sale of the Armitage property, and defendant agreed to forgive that outstanding balance in exchange for half of plaintiff's interest in the property. The court explained that "[t]he forgiveness of an existing debt can constitute a valid consideration to support a contract," citing *Stolzenbach v. Pagoria*, 71 Ill. App. 3d 863, 866 (1979). In addition, the court reasoned that plaintiff benefitted from the loans "because they served to keep his and [d]efendant's joint enterprise afloat." Therefore, the court concluded that plaintiff giving defendant an "additional 25% interest in the [Armitage] [p]roperty for the forgiveness of the loans GBD received from [d]efendant constitutes sufficient consideration for the quitclaim deed."

¶ 54                                    c. Count IV: Unjust Enrichment

¶ 55     The court explained that "[u]njust enrichment is not a separate cause of action that, standing alone, would justify an action for recovery. Rather, it is a condition resulting from improper conduct, such as fraud, duress, or undue influence, and may be redressed by a cause of action based upon that improper conduct," citing *Toushin v. Ruggiero*, 2021 IL App (1st) 192171, ¶ 80. Because

plaintiff could not establish his claims for fraud, he could not establish a derivative claim for unjust enrichment. Therefore, the court ruled in defendant's favor on count IV.

¶ 56                                d. Count V: Breach of Fiduciary Duty

¶ 57    The court found that " a fiduciary relationship existed as a matter of law between Defendant and Plaintiff" because they were the only shareholders of a closely held corporation, GBD, and they managed GBD together from 1991 to 2016. The court explained that this fiduciary duty was comparable to business partners' fiduciary duties, citing, *inter alia*, *Hagshenas v. Gaylord*, 199 Ill. App. 3d 60, 71 (1990), and *Jaffe Commercial Finance Co. v. Harris*, 119 Ill. App. 3d 136, 143 (1983). However, the court found that the parties' fiduciary duties did not extend to the sale of the Armitage property because GBD did not own the property; rather, the parties owned it in their individual capacities. The court further found that, with respect to the sale of the Armitage property, defendant did not owe plaintiff a fiduciary duty as a matter of fact because defendant did not have "superiority and influence" over plaintiff that would establish such a duty. Rather, both parties "were on even footing" as sophisticated businessmen with decades of experience in the beauty supply industry, and a Korean-speaking attorney represented both of them in selling the Armitage property. Therefore, the court ruled in defendant's favor on count V.

¶ 58                                e. Count VI: Joint Tenancy Act

¶ 59    Finally, the court ruled in defendant's favor on count VI, explaining that because "a valid quitclaim deed severed the joint tenancy, the Joint Tenancy Act does not apply to any actions taken after the deed was executed."

¶ 60    Plaintiff timely appealed.

¶ 61                                II. ANALYSIS

¶ 62    Plaintiff challenges the trial court's rulings on all six counts. In a bench trial, the court weighs the evidence and resolves issues of fact. *Nelson v. Brewer*, 2019 IL App (1st) 173143, ¶ 53. We defer to the trial court's factual findings unless they are against the manifest weight of the evidence. *Id.* " 'A factual finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based in evidence.' " *Id.* (quoting *Samour, Inc. v. Board of Election Commissioners of City of Chicago*, 224 Ill. 2d 530, 544 (2007)). We review questions of law *de novo* (*Dohrmann v. Swaney*, 2014 IL App (1st) 131524, ¶ 23), meaning that we perform the same analysis as the trial court (*Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011)).

¶ 63                              A. The Parties' Agreement

¶ 64    Before we address plaintiff's six counts, we must clarify the nature of the agreement at issue.

¶ 65    The parties signed a quitclaim deed that severed the joint tenancy and split the Armitage property and, by extension, its sale proceeds, 75/25 in defendant's favor. The parties dispute whether, before signing the quitclaim deed, they orally agreed to split the Armitage property sale proceeds 75/25 and why they did so.

¶ 66    Plaintiff's factual theory is that he never agreed to a 75/25 split. Rather, defendant physically forced him to "agree" to that split and then defrauded him into signing the quitclaim deed, which nobody explained to him and which he did not understand. Plaintiff's legal theories vary somewhat. On the one hand, plaintiff alleges there was no consideration for the parties' supposed agreement, meaning the agreement never existed. See *Carter v. SSC Odin Operating Co.*, 2012 IL 113204, ¶ 21 (consideration is an essential element for contract formation). On the

other hand, plaintiff appears to assume that such an agreement did exist but was the product of fraud, breached defendant's fiduciary duty to plaintiff, unjustly enriched defendant, and violated the Joint Tenancy Act.

¶ 67    Defendant claims that he and plaintiff agreed to a 75/25 split of the Armitage property sale proceeds to partially repay outstanding loans GBD owed him. Defendant initially proposed that plaintiff would receive $500,000, or 16.7%, of the Armitage property sale proceeds, but agreed that plaintiff would receive $750,000, or 25%, after plaintiff begged him for more money. According to defendant, the quitclaim deed reflected this agreement.

¶ 68    The parties' attorney, Soo Yeon Lee, presented a third theory. She testified that the parties always planned to conduct a like-kind exchange under section 1031 of the Internal Revenue Code (26 U.S.C. § 1031 (2008)) in which each brother would use his share of the Armitage property sale proceeds to buy his own separate business property, thereby deferring taxes on the Armitage property sale. The trial court found attorney Lee's testimony credible and concluded that the parties "planned to sell the [Armitage] Property as part of a 1031 like-kind exchange under Section 1031 of the Internal Revenue Code. They knew the prices of the specific properties they each intended to purchase with their shares of the proceeds." We defer to that factual finding. See *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002) ("[W]here findings of fact depend on the credibility of witnesses, it is particularly true that a reviewing court will defer to the findings of the trial court unless they are against the manifest weight of the evidence.").

¶ 69    Plaintiff argues that attorney Lee's account of the parties' agreement was against the manifest weight of the evidence. Plaintiff claims that attorney Lee "expressly disclaimed any knowledge of the alleged agreement's terms or whether an alleged agreement existed." That is not

accurate. Attorney Lee testified that nobody told her GBD owed defendant approximately $2 million. But she clearly and consistently testified that the parties intended to sell the Armitage property as part of a section 1031 exchange so that each brother could purchase his own business property.

¶ 70    Plaintiff also contends there was no evidence corroborating attorney Lee's testimony that the parties agreed to a section 1031 exchange. Specifically, plaintiff argues that neither he nor defendant testified about the section 1031 exchange and there was no documentary evidence reflecting such an agreement. But neither party had to corroborate attorney Lee's testimony about a transaction she personally handled for the trial court to find her credible. Therefore, we proceed with the understanding that the parties agreed to split the Armitage property and its sale proceeds 75/25 in defendant's favor so they could conduct a section 1031 exchange, and that the parties executed the quitclaim deed to effectuate that agreement.

¶ 71                                 B. Counts I and II: Fraud

¶ 72    To prevail on a claim for fraud, a plaintiff must establish by clear and convincing evidence (1) that the defendant made a false statement of material fact; (2) the defendant knew the statement was false; (3) the defendant intended to induce the plaintiff to act; (4) the plaintiff relied on that misrepresentation; and (5) the plaintiff suffered damages. *Hassan*, 408 Ill. App. 3d at 343. A defendant may commit fraud by misrepresentation or concealment. *Id.*

¶ 73    Plaintiff presented two theories of fraud: fraud in the inducement and recission based on fraud. To prove fraud in the inducement, a plaintiff must show that the defendant made a false representation knowing or believing it to be false and did so to induce the plaintiff to act. *Id.* A " 'representation may be made by words, or by actions or other conduct amounting to a statement

of fact.' " *Id.* (quoting *Glazewski v. Coronet Insurance Co.*, 108 Ill. 2d 243, 250 (1985)). To prevail on a claim for recission based on fraud, a plaintiff must prove all the elements of civil fraud. *Fogel v. Enterprise Leasing Co. of Chicago*, 353 Ill. App. 3d 165, 171 (2004). We will not reverse the trial court's ruling on a claim for fraud unless it is against the manifest weight of the evidence. *Hassan*, 408 Ill. App. 3d at 343.

¶ 74    Plaintiff claims that defendant told him that signing the quitclaim deed was necessary to sell the Armitage property, which was false. Assuming defendant made such a statement, it was not false. Attorney Lee explained as follows:

> "Q. Would it be accurate to say that this quitclaim deed and the Lee brothers executing this quitclaim deed was necessary to the real estate transaction that they came to you to represent them on?
>
> A. Yes, it was necessary.
>
> Q. And why—again, briefly, why was it necessary?
>
> A. It was because they owned this *** West Armitage building together as joint tenants, not as tenants in common but as joint tenants. So we had to sever the joint tenancy, so that they can buy they can be [*sic*] their own building owner for their new property, the replacement property."

Similarly, attorney Lee testified that the quitclaim deed "was a necessary step in order for [the parties] to do the closing and for them to buy the replacement properties." This testimony, which the trial court found credible, defeated plaintiff's allegation that defendant's statement was false. Because plaintiff did not establish the first element of fraud, the trial court's ruling in defendant's favor is not against the manifest weight of the evidence.

¶ 75    Plaintiff argues that defendant "committed fraud through his silence" by not disclosing that the quitclaim deed would convey half of plaintiff's interest in the Armitage property to defendant. Attorney Lee's testimony defeats this claim as well:

> "Q. When you talked to the brothers about the quitclaim deed that you had prepared, did you talk to them specifically about the fact that by signing this quitclaim deed, [defendant] would become the 75 percent owner of the property and [plaintiff] the 25 percent owner of the property?
>
> A. Yes.
>
> Q. Are you sure?
>
> A. Yes. That is what the document says and that's what I explained to them and that was the calculation[ ] that we ran before signing this document."
>
> ***
>
> Q. Did you have discussions with [defendant] and [plaintiff] about this 75 percent to 25 percent split even before the day that the quitclaim deed was signed?
>
> A. Yes."

Attorney Lee also testified that she explained the quitclaim deed to the parties in Korean, so plaintiff cannot rely on the language barrier to claim he did not understand what he was signing. Even if defendant himself did not tell plaintiff what effect the quitclaim deed had, plaintiff cannot establish that he did not know that signing the quitclaim deed would split the Armitage property 75/25 in defendant's favor. That is, plaintiff cannot show that he relied on defendant's silence in assuming that the quitclaim deed would split the Armitage property 50/50. Accordingly, we affirm the trial court's rulings on counts I and II.

¶ 76                    C. Count III: Lack of Consideration

¶ 77    Plaintiff argues there was no consideration for the quitclaim deed because (1) defendant never paid the $10 consideration the deed recited and (2) the evidence did not establish the existence or amount of defendant's loans to GBD, which he supposedly forgave as consideration for half of plaintiff's interest in the Armitage property.

¶ 78    "Consideration is a basic element for the existence of a contract." *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 330 (1977). Any act or promise that benefits one party or disadvantages the other party is a sufficient consideration to support a contract. *Id.* Courts generally do not question whether the amount of consideration was adequate. *Northwest Diversified, Inc. v. Desai*, 353 Ill. App. 3d 378, 390 (2004). But plaintiff contends there was *no* consideration for the quitclaim deed, so we must determine whether consideration existed. See *Agnew v. Brown*, 96 Ill. App. 3d 904, 908 (1981). Consideration must support a quitclaim deed that conveys an interest in land; otherwise, the deed is invalid. *Id.* at 909; *Blaise v. Stein*, 75 Ill. App. 3d 793, 797 (1979). We review *de novo* whether consideration supported the quitclaim deed in this case. See *Dohrmann*, 2014 IL App (1st) 131524, ¶ 23.

¶ 79                    1. Recited Consideration

¶ 80    A deed that is regular on its face and that conveys an interest in land raises a presumption that the consideration for the conveyance was the consideration recited in the deed. *In re Estate of Khan*, 2021 IL App (1st) 200278, ¶ 24. Introducing the deed into evidence constitutes a *prima facie* showing that the grantor received the consideration the deed recites. *Id.* The party alleging lack of consideration has the burden of proving that he did not receive the recited consideration. *Id.*

¶ 81 Here, the quitclaim deed was in evidence, and it identified "consideration of the sum of Ten Dollars ($10.00), receipt of which is hereby acknowledged." That created a presumption and constituted a *prima facie* showing that plaintiff received $10 in exchange for conveying half his interest in the Armitage property to defendant. But plaintiff testified that defendant did not pay him $10 or any other amount of money for signing the quitclaim deed. Attorney Lee, whom the trial court found credible, confirmed that defendant did not pay plaintiff anything for the quitclaim deed. Defendant presented no evidence that he paid plaintiff anything as consideration. Because the evidence undisputedly established that plaintiff did not receive $10 as consideration, plaintiff rebutted the presumption that the recited consideration supported the quitclaim deed. Therefore, we must determine whether plaintiff received actual consideration for the quitclaim deed. See *id.*

¶ 82                                    2. Actual Consideration

¶ 83 The concept of actual consideration recognizes that, in some cases, the consideration that a party actually received may not be the same as what the document in question recited. *Polo National Bank v. Lester*, 183 Ill. App. 3d 411, 415 (1989); *Robbs v. Illinois Rural Rehabilitation Corp.*, 313 Ill. App. 418, 427 (1942). "Any act or promise which is of benefit to one party or disadvantage to the other is a sufficient consideration to support a contract." (Internal quotation marks omitted.) *Carter*, 2012 IL 113204, ¶ 23. Our supreme court recognizes three forms of consideration: (1) detriment to the offeror, (2) benefit to the offeree, or (3) a bargained-for exchange between them. *Doyle v. Holy Cross Hospital*, 186 Ill. 2d 104, 112 (1999).

¶ 84 We find that consideration supported the quitclaim deed because it created a tax benefit to plaintiff. Attorney Lee testified that the quitclaim deed facilitated an exchange under section 1031

of the Internal Revenue Code (26 U.S.C. § 1031 (2008)), which allowed plaintiff to defer capital gains taxes on the Armitage property sale. Specifically, attorney Lee testified as follows:

"Q. Now, what was the purpose of this quitclaim deed? Why did you prepare a quitclaim deed that, as you put it, severed the joint tenancy?

A. It is to sever the joint tenancy because they own this property as joint tenants. Meaning, it's joint tenants. We have to separate so that they can go, after the closing, buy their own separate buildings. This was a 1031 exchange transaction, so they were selling this and they were using the sales proceeds to purchase their own buildings.

Q. When you say this was a 1031 transaction, what do you mean by that?

A. 1031 is IRS Tax Code 1031, deferred—that allows the property owners to defer capital gains tax, if you use the entirety of the sales proceeds to buy another like-kind property.

Q. When the Lee brothers approached you to represent them, was it your understanding that each of them were to buy a separate property with their share of the proceeds of the sale of the building?

A. Yes.

Q. Okay. Did they tell you that the first time that you talked to them?

A. I don't recall exactly, but that was the plan for a really long time.

Q. When you say 'for a really long time,' was it the plan before you ever started drafting this particular quitclaim deed that's now marked as Plaintiff's Exhibit 3?

A. Yes, [a] long time before this. I started representing them, I think, in 2014, and in 2014 and 2015, we had two other buyers [for the Armitage property] that ultimately

terminated the contract. And then this was a third buyer, so we had been planning for the 1031 exchange for a really, really long time."

By signing the quitclaim deed and severing the joint tenancy, plaintiff allowed himself to defer capital gains taxes on the proceeds of the sale of the Armitage property if he purchased another like-kind property for business purposes within 180 days. See 26 U.S.C. § 1031 (2008); *Lobo IV, LLC v. V Land Chicago Canal, LLC*, 2019 IL App (1st) 170955, ¶ 5; *Weber-Stephen Products, Inc. v. Department of Revenue*, 324 Ill. App. 3d 893, 902-03 (2001). That tax benefit to plaintiff was consideration.

¶ 85 We acknowledge that the evidence did not indicate whether plaintiff completed a section 1031 exchange by purchasing another business property. But that does not defeat consideration. In the context of consideration, a benefit need not be a certain gain; it simply means that the party in question obtained a right he did not have before. *F.H. Prince & Co, Inc. v. Towers Financial Corp.*, 275 Ill. App. 3d 792, 798-99 (1995) (citing *Hamilton Bancshares, Inc. v. Leroy*, 131 Ill. App. 3d 907, 913 (1985)). Here, the quitclaim deed severed the joint tenancy and apportioned the parties' interests in the Armitage property, which facilitated selling the property and produced funds that plaintiff could use to purchase another business property and defer taxes on the Armitage property if he wished to do so. The quitclaim deed was part of a process that produced a tax benefit plaintiff did not previously have.

¶ 86 Much of plaintiff's brief focuses on the trial court's finding that defendant partially forgave GBD's outstanding loans, which was consideration because it was a detriment to defendant in that he could not collect the full balance. Cancelling a debt can serve as consideration for conveyance of an interest in land. *Blaise*, 75 Ill. App. 3d at 795-97. But we are skeptical that defendant's

evidence established any amount he could have forgiven. Based on our review of the evidence, defendant may have loaned GBD anywhere from $1,298,300 (per his in-court reconciliation of his records) to $5,941,669 (per his handwritten notes). GBD may have repaid defendant anywhere from $559,959 (per his interrogatory responses) and $3,854,629 (per his handwritten notes). Depending on which figures one uses, GBD may have repaid defendant far more than it owed. For example, using defendant's in-court reconciliation, he loaned GBD $1,298,300, and using one of his in-court estimates, GBD repaid $2.3 million, meaning that GBD overpaid him by more than $1 million and there was no debt to forgive. Furthermore, at various points throughout the trial, defendant testified to $2.3 million as the amount he loaned GBD, the amount GBD repaid, and the amount outstanding as of February 2016. That is impossible. We cannot reconcile defendant's varying figures into a reliable outstanding balance as of February 2016.

¶ 87    But we need not rely on defendant's contradictory evidence of GBD's supposed indebtedness to find consideration. Similarly, we need not rely on the trial court's finding that plaintiff obtained non-tax benefits such as defendant keeping GBD afloat through his loans to the company. Consideration exists if there is a detriment to one party, a benefit to the other party, *or* a bargained-for exchange between them. *Doyle*, 186 Ill. 2d at 112. As explained above, plaintiff obtained a tax benefit from signing the quitclaim deed. "We may affirm the trial court's judgment following a bench trial on any basis in the record, regardless of whether the trial court relied on that basis." *Horwitz v. Sonnenschein Nath & Rosenthal*, 2018 IL App (1st) 161909, ¶ 25. Accordingly, we affirm the trial court's ruling in defendant's favor on count III.

¶ 88                    D. Count IV: Unjust Enrichment

¶ 89    Plaintiff contends the quitclaim deed unjustly enriched defendant because it granted him an extra 25% of the property to which he was not entitled.

¶ 90    To prevail on a claim for unjust enrichment, a plaintiff must prove that "the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Toushin*, 2021 IL App (1st) 192171, ¶ 80 (citing *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 160 (1989)). "Unjust enrichment is not a separate cause of action that, standing alone, would justify an action for recovery." (Internal quotation marks omitted.) *Id.* "Rather, it is a condition resulting from improper conduct such as fraud, duress, or undue influence, and may be redressed by a cause of action based upon that improper conduct." (Internal quotation marks omitted.) *Id.*

¶ 91    Plaintiff did not establish his fraud claims for the reasons explained above, so he cannot succeed on a derivative claim for unjust enrichment. See *id.* Plaintiff makes no other argument in support of reversing the trial court's ruling on this claim. Accordingly, we affirm the trial court's ruling on count IV.

¶ 92                            E. Count V: Breach of Fiduciary Duty

¶ 93    Plaintiff argues that defendant breached his fiduciary duty "by orchestrating a scheme to retain an undue portion of the sales proceeds and refusing to return [plaintiff's] rightful share."

¶ 94    To prevail on a claim for breach of fiduciary duty, a plaintiff must prove that (1) a fiduciary duty existed; (2) the defendant breached the fiduciary duty; and (3) that breach proximately caused damages. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 69.

¶ 95                                    1. Fiduciary Duty

¶ 96    Whether defendant owed plaintiff a fiduciary duty is a question of law we review *de novo*. See *Schaff v. Travelers Home and Marine Insurance Co.*, 2025 IL App (1st) 240276, ¶ 178 (citing *Van Dyke v. White*, 2019 IL 121452, ¶ 68 and *231 W. Scott, LLC v. Lakeside Bank*, 2017 IL App (1st) 161131, ¶ 30).

¶ 97    There is no dispute that GBD was a corporation, the parties were its only shareholders, and each brother owned a 50% share of the company. Defendant managed GBD's finances and accounting while plaintiff managed warehouse operations. Therefore, GBD was a closely held corporation. See *Galler v. Galler*, 32 Ill. 2d 16, 27 (1964) (in a closely held corporation, stock is held "in a few hands, or in a few families" and is rarely if ever traded); *Osaghae v. Oasis Hospice and Palliative Care, Inc.*, 2021 IL App (1st) 200515, ¶ 67 (unlike a public corporation, the shareholders in a closely held corporation often play large roles in the day-to-day management of the business).

¶ 98    Shareholders of a closely held corporation owe fiduciary duties to each other much like partners in a business partnership. *Hagshenas*, 199 Ill. App. 3d at 71; *Illinois Rockford Corp. v. Kulp*, 41 Ill. 2d 215, 217-18 (1968); *Levy v. Markal Sales Corp.*, 268 Ill. App. 3d 355, 364-65 (1994). That is true even if the parties did not incorporate GBD as a closely held corporation under article 2A of the Business Corporation Act of 1983 (Ill. Rev. Stat. 1991, ch. 32, ¶ 2A.05). See *Kazemi v. Maron Electric Co.*, 2026 IL App (1st) 250908, ¶¶ 61-62. Therefore, plaintiff and defendant owed each other fiduciary duties as co-owners of GBD.

¶ 99    We acknowledge that GBD did not own the Armitage property; rather, the parties owned it individually as joint tenants. But the evidence established that the parties' ownership of the Armitage property was inseparable from their ownership of GBD. The parties bought the Armitage

property to serve as GBD's headquarters in 1991, the same year they formed GBD. The parties sold the Armitage property in 2016 as part of closing GBD. There is no evidence either party had a personal interest in the Armitage property beyond GBD's business operations. For all practical purposes, the Armitage property was a business asset of GBD. See *In re Marriage of Wilson*, 110 Ill. App. 3d 809, 815 (1982) ("Where real estate is bought with partnership funds for partnership purposes, and is applied to partnership uses or entered or carried on the account of the firm as a partnership asset, it is deemed to be firm property." (Internal quotation marks omitted.)). Therefore, the parties owed each other fiduciary duties with respect to the Armitage property. See *Hagshenas*, 199 Ill. App. 3d at 70-71; *Bakalis v. Bressler*, 1 Ill. 2d 72, 75 (1953) (a business partner "cannot divorce the real estate from the partnership business and thus remove it from the protection of the fiduciary relationship."). We now consider whether defendant breached that duty.

¶ 100                                    2. Breach

¶ 101    When two individuals each own 50% of a closely held corporation, their fiduciary duties to each other are like those of business partners. *Anest v. Audino*, 332 Ill. App. 3d 468, 476 (2002). Each partner "owes a duty to exercise the highest degree of honesty and good faith in the dealings and in handling of business assets, thereby prohibiting enhancement of personal interests at the expense of the interests of the enterprise." *Hagshenas*, 199 Ill. App. 3d at 71. Whether defendant breached his fiduciary duty is a question of fact we review under the manifest weight standard. See *Indeck Energy Services, Inc. v. DePodesta*, 2021 IL 125733, ¶ 56.

¶ 102    The evidence did not establish that defendant enhanced his personal interests at the expense of GBD's interests. On the contrary, the evidence showed that the parties agreed to close GBD and sell the Armitage property as part of that process. To the extent plaintiff argues that defendant

profited at plaintiff's expense (as opposed to GBD's expense), that is essentially the same as what plaintiff's fraud claims allege. Plaintiff frames many of his arguments regarding defendant's breach of fiduciary duty in terms of defendant committing fraud. For the reasons explained above, we defer to the trial court's credibility determination accepting attorney Lee's account, which defeats plaintiff's allegations of fraud. The quitclaim deed was a necessary step in an agreed-upon process to close GBD and allow the parties to pursue their own business interests separately. Business partners can agree to close a business and divide its assets without breaching their fiduciary duties to each other. Therefore, the quitclaim deed did not breach defendant's fiduciary duty to plaintiff.

¶ 103   Plaintiff argues that the trial court should have presumed that the quitclaim deed was fraudulent and put the burden on defendant to rebut that presumption. That analysis applies when the parties did not have a fiduciary relationship as a matter of law, but clear and convincing evidence shows that "one party placed trust and confidence in the other so that the latter gained influence and superiority over the former." (Internal quotation marks omitted.) *In re Estate of Feinberg*, 2014 IL App (1st) 112219, ¶ 32. This scenario usually arises among family members where there is a significant disparity in age, health, mental condition, education, and business experience such that the "servient" party entrusts his or her business affairs to the "dominant" party. *Id.* Once that type of "fiduciary relationship is shown to exist, the presumption is that a transaction between the dominant and servient parties which profits the dominant party is fraudulent." *Id.* "The dominant party then has the burden of proving by clear and convincing evidence that the transaction was fair and equitable and did not result from his undue influence over the servient party." (Internal quotation marks omitted.) *Id*.

¶ 104 In this case, the parties had a fiduciary relationship as a matter of law because they were the only shareholders of a closely held corporation. See *Kulp*, 41 Ill. 2d at 222; *Anest*, 332 Ill. App. 3d at 476; *Hagshenas*, 199 Ill. App. 3d at 69. Therefore, the presumption of fraud and burden-shifting set out above did not apply. See *Feinberg*, 2014 IL App (1st) 112219, ¶ 32. Even if it did, the evidence showed that plaintiff and defendant were equal business partners, not that they had a significant disparity in age, health, mental condition, education, or business experience. See *id.* Both brothers immigrated to the United States in the 1980s and have been in the beauty supply business since that time. They shared management duties while operating GBD from 1991 to 2016. Although defendant managed GBD's finances, plaintiff had access to the company's financial records. Attorney Lee represented both parties throughout the sale of the Armitage property, almost always met with them together, and explained documents she drafted to them in Korean. Therefore, there was no "dominant" or "servient" party, and the burden would not have shifted to defendant to prove that the quitclaim deed was fair and equitable. This case is not like those in which a fiduciary relationship existed due to one party's age or disability. See, *e.g.*, *In re Estate of Teall*, 329 Ill. App. 3d 83, 85-87 (2002) (a neighbor who cared for an elderly woman with Alzheimer's disease was a fiduciary in fact). Accordingly, we affirm the trial court's ruling that defendant did not breach his fiduciary duty to plaintiff.

¶ 105 F. Count VI: Joint Tenancy Act

¶ 106 Finally, plaintiff contends that defendant violated the Joint Tenancy Act because he retained more than 50% of the proceeds of the Armitage property sale. The Joint Tenancy Act provides that:

"[w]hen one or more joint tenants, tenants in common or co-partners in real estate, or any interest therein, shall take and use the profits or benefits thereof, in greater proportion than his or their interest, such person or persons, his or their executors and administrators, shall account therefor to his or their cotenants jointly or severally." 765 ILCS 1005/4a (West 2016).

However, this "statute does not come into effect until it is determined a co-owner in real estate has actually taken proceeds or benefits in greater proportion than his ownership interest in the property." *Hall v. Eaton*, 258 Ill. App. 3d 893, 897 (1994). That did not happen in this case. The quitclaim deed entitled defendant to 75% of the proceeds of the Armitage property sale and there is no dispute that is what he received. The property sale master statement confirms as much. The trial court's ruling in defendant's favor is not against the manifest weight of the evidence. Plaintiff makes no other argument in support of reversing the trial court's ruling on this claim. Accordingly, we affirm the trial court's ruling on count VI.

¶ 107                                      III. CONCLUSION

¶ 108   For the foregoing reasons, we affirm. the judgment of the circuit court of Cook County.

¶ 109   Affirmed.